## Commonwealth v. Burns

*Donald W. Vanartsdalen,* assistant district attorney, for Commonwealth.

*J. Leslie Kilcoyne* and *Paul R. Beckert,* for defendant.

BIESTER, J., January 5, 1953.—This matter comes before the court on defendant's motion for a new trial and in arrest of judgment for conviction of defendant on the charge of involuntary manslaughter.

As to the motion for a new trial defendant contends that the verdict was against the law, against the evidence, and against the charge of the court; that the court's charge was misleading in overemphasizing the definition of ordinary negligence and in not defining or illustrating rash conduct and gross or wanton negligence.

Defendant was charged on two separate bills of indictment with the offense of involuntary manslaughter and operating a motor vehicle while under the influence of intoxicating liquor. It is not necessary to discuss the evidence produced in support of the second charge as the jury saw fit to acquit defendant of this offense. We may say, however, there was ample evidence to have justified such a conviction.

Accepting the Commonwealth's evidence for the purposes of the disposition of the matter for a new trial, the evidence in support of the conviction of the offense of involuntary manslaughter, disassociated from the charge of operating a motor vehicle while under the influence of intoxicating liquor, reveals the following:

On January 1, 1952, shortly after two o'clock in the morning, one Donald Shuman, proceeding through the Borough of Morrisville in this county, turned onto the Lincoln Highway, or Route U. S. 1, a four-lane highway. He was traveling in a westerly direction toward Philadelphia. The evidence is in conflict as to whether the highway was wet, but at the time of the accident it was not raining.

As Mr. Shuman proceeded he observed defendant's car which was proceeding in front of him in the same direction as the witness was traveling. He stated that defendant was "weaving over all four lanes" and was traveling at a rate of speed between 50 and 60 miles an hour. The witness proceeded to follow defendant's car, driving at approximately the same rate of speed and being about 75 feet to the rear thereof. After following defendant for approximately three miles he observed a man standing in the center of the highway. Just as defendant's car approached the standing man, it swerved to the left across the center line of the highway in the direction of the standing pedestrian. The victim then started to run to the north, or to the right side of the highway as defendant was driving. Defendant then swerved to the right and struck the pedestrian, who died as the result of the accident.

At the point of accident on the southerly side of the Lincoln Highway was a well-lighted service station. Defendant, after striking the deceased, proceeded for a distance of approximately 200 to 300 feet where he came to a stop.

Alfred Rossi, son of Anthony Rossi, Sr., the victim of the accident, testified that immediately before the accident he had driven his automobile into the service station for the purpose of obtaining water for its radiator. His father, driving another motor vehicle, had stopped his vehicle on the shoulder of the northerly side of the highway. Just before leaving the gasoline station the witness observed his father and uncle walking across the highway in his direction. The witness then drove his car to the northerly side of the highway and parked it directly in front of his father's vehicle, awaiting the return of his uncle and father from the gas station. The uncle returned to the northerly side of the highway and entered the car of the witness' father. The witness then observed his father crossing

the highway. After having crossed two lanes he stood in the middle of the highway. As he watched, defendant's car came toward his father, who started to run to avoid being struck, at which time the impact took place.

Upon being interrogated as to how the accident occurred, defendant told one of the officers that as far as he knew there was no accident. On another occasion he said he "wasn't sure whether he hit the man or not". And again, when asked how the accident happened, said "that he really couldn't tell".

When testifying during the course of the trial defendant said that the victim was "streaking across the highway in front of my car" when first seen by him, and that Mr. Rossi had crossed over to the northerly side of the highway "about two steps" when first seen.

It, therefore, appears that the jury would be justified in finding as a fact that defendant operated his motor vehicle somewhere between 50 and 60 miles an hour; that approaching the scene of the accident his car was weaving back and forth across the highway; that the deceased stood in the center of the highway as defendant's car approached; that defendant failed to observe him and swerved his car onto the southerly half of the highway to his own left and in the direction of the victim; that when the car so swerved the victim ran forward in order to avoid being struck and defendant's car turned toward him and struck him. This being the evidence, we believe it clearly revealed such a degree of negligence as to evidence a disregard for human life and an indifference to consequences and constituted the crime of involuntary manslaughter.

The other assigned reasons in support of the motion for a new trial are based on alleged error in the court's charge, in that it is contended that the court accentuated the definitions of ordinary care and ordinary neg-

ligence and thus may have created a misconception in the minds of the jury as to the degree of negligence required to justify a conviction.

The method pursued was first to define involuntary manslaughter, after which we added that "mere carelessness or negligence is not sufficient. There must be an element in this negligence of rashness or recklessness". We then defined negligence in its ordinary sense and also advised the jury as to the meaning of the expression "ordinary care". After having done so, we admonished the jury that we were defining negligence in its ordinary and usual sense in the law. We then said:

"It is not the type of negligence that is required in order to find this defendant guilty of the offense of involuntary manslaughter on the second theory of involuntary manslaughter, or, we repeat, mere negligence is not sufficient. It must go further than mere negligence and must, we repeat, be so negligent as to constitute unlawful conduct such as to evidence disregard for human life or an indifference to consequences."

We then instructed the jury as to the necessity of having one's motor vehicle under control, and the responsibility of the operator of a motor vehicle traveling by night. This was immediately followed by the admonition that these instructions regarding negligence, and ordinary care, and the necessity of the control of a vehicle at night, had to do with the term negligence without regard to its degree, and then immediately said:

"We again instruct you, however, that in order for this defendant to be guilty of the offense of involuntary manslaughter on the second theory of manslaughter, that this negligence must be more than mere negligence and must constitute rash conduct and gross or wanton negligence."

Not content with this we twice afterward in the charge admonished the jury of the extent of negligence required in order to justify a conviction of the offense of manslaughter.

In face of this constant repetition, we fail to see how the jury could have possibly been misled as to the extent or degree of negligence required to justify a conviction. An examination of the entire charge fails to reveal that it prejudiced the right of defendant whatever, it being replete with cautionary expressions to prevent the jury's being confused as to the degree of recklessness required to support the charge of manslaughter.

The argument in support of the motion in arrest of judgment which gives us the most concern in this case is the contention that we are without jurisdiction by reason of the victim's having died in the State of New Jersey, although the accident from which he died occurred in this county.

The only statutory law in reference to this problem is the Act of March 31, 1860, P. L. 427, sec. 47, 19 PS §523, which is as follows:

"If any person shall be feloniously stricken, poisoned, or receive other cause of death within the jurisdiction of this state, and shall die of such stroke, poisoning or other cause of death at any place out of the jurisdiction of this state, an indictment therefor found by the jurors of the county in which such stroke, poisoning or other cause of death shall happen as aforesaid, shall be as good and effectual, as well against the principal in any such murder, as against the accessory thereto, as if such felonious stroke, poisoning or other cause of death, and the death thereby ensuing, and the offense of such accessory, had happened in the same county where such indictment shall be found; and the courts having jurisdiction of the offense shall proceed upon the same, as well against principal as accessory, as

they could in case such felonious stroke, poisoning or other cause of death, and the death thereby ensuing, and the offense of such accessory, had both happened in the same county where such indictment shall be found."

Although the phraseology "feloniously stricken, poisoned, or receive other cause of death" is rather ambiguous in that it might conceivably be construed to be disjunctive, in that "receiving other cause" of death need not necessarily mean felonious cause of death, we believe any doubt as to its meaning has been resolved by the further phraseology to the effect that an "indictment . . . found by the jurors of the county in which such stroke, poisoning, or other cause of death shall happen as aforesaid, shall be as good and effectual, as well against the principal *in any such murder*", etc.

The only case in Pennsylvania which we have been able to discover which construes this phraseology is that of Commonwealth v. Hagen, 4 D. & C. 719, which discusses the effect of the previous paragraph of the same act of assembly, treating of the same subject when death results in a county other than the one in which the cause of death is received.

That act is as follows:

"If any person hereafter shall be feloniously stricken, poisoned, or receive other cause of death in one county, and die of the same stroke, poisoning or other cause of death in another county, then an indictment found therefor by jurors of the county where the person was feloniously stricken, poisoned or received other cause of death, shall be as good and effectual in law, as well against the principal in such murder as against the accessory thereto, as if the death had occurred in the same county where such indictment shall be found; and the proper courts having jurisdiction of the offense shall proceed upon the same as they

might or could do in case such felonious stroke, poisoning or other cause of death, and the death itself thereby ensuing, had been committed and happened all in one and the same county."

In the Hagen case the court, in construing this section, says:

"It is to be noticed that this statute applies to a felonious striking, poisoning or receiving other cause of death. It pertains to a cause of death received in one county and death in another. In terms it is applicable to a misdemeanor homicide, and there is reason why it should be so interpreted."

There is no discussion in the court's opinion as to the process of reasoning by which this conclusion is reached. Although we agree that the statute in question may be subject to more than one construction, we believe it to be of such uncertainty as to constitute a weak foundation on which we might exclusively rely in reaching our conclusions.

Without regard to the statutory law, we think there can be no dispute with the proposition that this county has jurisdiction of the crime if it was committed in Bucks County.

Under early common law, there appears to be at least doubt as to the venue where the blow was struck in one jurisdiction and death resulted in another. One finds a lack of uniformity among our text book writers regarding this subject, some of whom hold that the jurisdiction was fixed at the place at which the mortal stroke was given, whereas others contend that neither the place where the blow was struck nor the place of the resultant death could properly try the case.

Whatever that status may have been, the uncertainty was remedied by the Statute of 2 and 3 Edward the VI, chapter 24, the effect of which placed the venue in the county where the death occurred. This statute is not among those reported by the judges of our Su-

preme Court as being in force in this Commonwealth. Even where in force, however, it does not divest the jurisdiction of the place where the blow was struck: Wharton's Criminal Law, vol. 1, sec. 339, and the cases therein cited.

Although we find a diversity of opinion regarding the place of venue under old common law, there is a unanimity of thought expressed by our text writers that the crime is complete in the jurisdiction in which the blow or other cause of death occurred, the death being regarded as a result of the crime rather than an integral part of it.

Bishop on Criminal Law, page 68 (9th ed.), says:

"Within well established principles, it is competent for legislation to make punishable the whole of any offense whereof a material part was committed within the jurisdiction. But the true doctrine is that the death is no part of a murder, which is wholly committed at the time and place of the blow, though the death is subsequent and elsewhere."

In 26 Am. Jur. 320, §237, the following statement is set forth:

"The crime is complete in the jurisdiction in which the act which causes death is done, and the death itself is regarded merely as a consequence."

Twenty-two C. J. S. 290, §185q, states that:

"Where a mortal blow was inflicted or poison was given in one county and death ensued in another, it was doubted at common law whether the homicide could be tried in either. The courts, however, have held that there is jurisdiction in such a case, most of them holding that the prosecution should be in the county where the blow was given or where the poison was administered." See also Wharton's Criminal Law, supra.

Not only are our text writers in accord on this subject, but a number of well considered cases support

this view. The case most frequently cited, perhaps because of its notoriety, is that of U. S. v. Guiteau, 1 Mackey 498, 47 Am. Rep. 247, in which it was held that the Supreme Court of the District of Columbia was the proper tribunal to try the accused, charged with the murder of President James A. Garfield, the shot having been fired in the City of Washington, District of Columbia, and the death having taken place in the State of New Jersey.

Another leading and well considered case on this subject is that of the Commonwealth of Kentucky v. Apkins, 148 Kentucky 207, 146 S. W. 431, annotated in L. R. A. (N. S. 39), page 822.

In that case defendant was indicted in Kentucky for the murder of one Lizzie Young Apkins by administering poison and by striking her. The indictment charged the offense in Jessamine County, Kentucky, but it was conceded that the blows were struck and the poison administered in Cincinnati, Ohio. It was the opinion of the lower court that it did not have jurisdiction and the demurrer was, therefore, sustained, from which the Commonwealth appealed.

After citing a number of cases from various jurisdictions, the reviewing appellate court concludes by saying:

"Thus it appears that, not only at common law, but in states where the question of jurisdiction is regulated by statute, courts have, with a degree of uniformity, held that the crime is committed at the place where the act is done which results in the injury or death; and that the prosecution for such act is properly conducted at the place where the act is done, and not where the death may occur. Here it is conceded that the assault was made and the poison administered in the City of Cincinnati, State of Ohio, and the wrong was done there. It was a completed transaction so far as the appellee was concerned, as much so as though he

had shot her or otherwise inflicted upon her person a mortal wound, and, according to the well-recognized rule, the courts of that state alone have jurisdiction to punish the offense. The trial court correctly so held."

The annotation accompanying the report of the case in L. R. A. sets forth numerous cases in many jurisdictions, which need not be cited here, in support of the view that it is well settled that the courts of the State where the mortal wound is inflicted, although the death occurs in another State, may indict and punish the criminal.

A later case supporting the same view is State v. Stelly, 149 La. 1022, 90 So. 390.

In Commonwealth v. Hagen, supra, in discussing the problem of jurisdiction where the deceased was struck by an automobile in Delaware County, and died in Montgomery County, both in the State of Pennsylvania, the court in discussing the same problem that is now presented before us, says, page 340:

"In the absence of any statutory regulation, the question would be, whether the crime is complete where the blow is struck, in which view the death is to be considered merely as a consequent of the crime, or whether the crime is not complete until a death occurs, in which view the crime is to be considered as divisible into two parts, one part happening in one jurisdiction, and another part in another, and neither complete without the other. Upon the question thus presented, it makes no difference whether the crime is to be considered as a felony or misdemeanor. The fact is complete or incomplete in the county where the blow was struck, whether it be called a felony or misdemeanor."

We are in accord with this view and that the wrongful and unlawful infliction of the injury upon the victim is not only a personal wrong inflicted upon the victim while under the protection of the laws of this State, but the peace and dignity of this State, and not

the State where the death ensued, is offended. The effect of the injury inflicted aggravates the nature of the offense committed, but is a consequence and result and not a part of the offense itself. Any contention that the place of death has exclusive jurisdiction of the crime could not be sustained by reason or law. To hold in this day of ease of modern travel that in the absence of expressed statutory authority, no State has jurisdiction of an offense such as occurred in the case before us is not only unrealistic, but inconsistent with the law as it has long been recognized in this country.

This view is in accord with the A. L. I. Restatement of Law of Conflict of Laws, §§377 and 428, the former having to do with torts and the latter to do with crimes. In both instances it is the impinging of the force upon the body which fixes the venue and not the place of death.

And now, to wit, January 5, 1953, defendant's motion in arrest of judgment is discharged and dismissed and the motion for a new trial refused. Defendant is directed to present himself before the court for sentence upon the district attorney's direction.